```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
SECUNDINO BAJANA,                      :    08 Civ. 8579 (RMB)(JCF)
                                       :
                    Plaintiff,         :       REPORT and
                                       :       RECOMMENDATION
     - against -                       :
                                       :
MICHAEL J. ASTRUE,                     :
Commissioner of Social Security,       :
                                       :
                    Defendant.         :
- - - - - - - - - - - - - - - - - - -:
```

TO THE HONORABLE RICHARD M. BERMAN, U.S.D.J.:

Secundino Bajana brings this action pursuant to section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a determination of the Commissioner of Social Security (the "Commissioner") finding that he was not disabled until September 1, 2004, and therefore is not entitled to Supplemental Security Disability Insurance Benefits ("DIB") at all and was not entitled to Supplemental Security Income ("SSI") until that date. The defendant has submitted a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, I recommend that the Commissioner's motion be granted.

Background

A.   Personal History

The plaintiff was born in 1957 in Guayaquil, Ecuador. (Tr. at 37, 480).  He received a general equivalency diploma and attended college for a period of no more than one year.  (Tr. at 126, 429).

1

He has experience in book printing and binding, having worked from 1982 to 1997 at various printing and binding companies.  (Tr. at 136, 414, 431-32, 480-81, 486-88).  His responsibilities included sweeping floors, boxing books, and operating and repairing machines.  (Tr. at 137-42).  These jobs required him to stand or walk most of the time and to stoop or kneel for at least one hour in each eight-hour workday.  (Tr. at 137-42, 487).  While sweeping the floor and boxing books required him to lift weights of up to ten pounds, other jobs required him to lift fifty pounds routinely and, on occasion, seventy pounds.  (Tr. at 137-42, 431, 487).  In 1997, the plaintiff injured his back while on the job and stopped working.  (Tr. at 411, 432, 480-81).

The plaintiff has not worked at any job since his injury in 1997.  (Tr. at 432).  In 2000, he stated that he was living alone but spent time at the homes of his siblings; in 2002, he was living with his brother.  (Tr. at 133-135, 412, 483).  After he stopped working, he spent his day laying down, sleeping, or going for a walk.  (Tr. at 485).  He had two children and was separated from his wife.  (Tr. at 483).

B.  Medical History

After his back injury, the plaintiff had MRIs of his lumbar spine on March 18 and June 24, 1997.  (Tr. at 154, 155).  The first scan revealed degenerative disc disease at the L4-L5 and L5-S1 levels with a small central and left paracentral disc herniation at

2

the L4-L5 disc space.    (Tr. at 154).    The second found straightening of the lordosis,[1] a partially degenerated L4-L5 disc with a diffuse bulge, and a partially degenerated L5-S1 disc.  (Tr. at 155).  Mr. Bajana underwent discectomy surgery at the L4-L5 and L5-S1 interspaces on November 7, 1997.  (Tr. at 156-57).  A follow-up MRI on April 24, 1998 showed no evidence of recurrent disc herniation or spondylitis.[2]  (Tr. at 158).

     In the fall of 1998, the plaintiff sought medical treatment at a clinic at Gouveneur Hospital.  (Tr. at 162-67A).  During a visit on September 18, he complained of a headache and slight dizziness and was described as having a history of lower back pain.  (Tr. at 162A).   He  was  diagnosed  with  diabetes  mellitus,[3]  tension headaches, obesity, and lower back pain following surgery.  (Tr. at 162).  On a return visit on October 19, results were unchanged and he was diagnosed with diabetes and depression.  (Tr. at 165-66).  On a third visit on November 16, the plaintiff was diagnosed with back pain and given a referral for a psychological evaluation. (Tr. at 164, 167).

--------------------------------------------------

     [1] Lordosis refers to the "concave portion of the spinal column as seen from the side."  Dorland's Illustrated Medical Dictionary 1090 (31st ed. 2007).

     [2] Ankylosing spondylitis is a "form of degenerative joint disease."  Dorland's at 1779.

     [3] Diabetes mellitus is "a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance." Dorland's at 513.

In a January 24, 1999 letter drafted in response to an inquiry from the plaintiff's attorney, the plaintiff's neurosurgeon, Dr. Thomas Peterson, stated that the plaintiff had post-operative physical therapy and, although his leg pain improved, he continued to have back pain. (Tr. at 159). Dr. Peterson recommended that Mr. Bajana undergo facet block injections and, if the injections did not improve the condition, that he undergo spinal fusion. (Tr. at 159). Mr. Bajana refused the injection treatment because the results were "not guaranteed." (Tr. at 434). Dr. Peterson also reported that the plaintiff saw a Dr. Krieger for an independent medical examination on June 29, 1998 and that Dr. Krieger's impression was that plaintiff required no further treatment. (Tr. at 159).

On January 22, 1999, Mr. Bajana also began mental health treatment at Gouverneur Hospital's Department of Psychiatry. (Tr. at 172). He saw a psychiatrist who reported that the plaintiff was fully oriented and alert with depressed mood and flat affect, but no suicidal or homicidal ideation. (Tr. at 172). The psychiatrist diagnosed him with depressed mood and ruled out adjustment disorder and impulse control disorder. (Tr. at 172). Mr. Bajana returned to Gouverneur Hospital's Department of Psychiatry on March 10, 1999 for a complete evaluation. (Tr. at 173-79). Dr. Jean Bastien diagnosed him with "major depression without psychotic features" and evaluated him as scoring 60 on the Global Assessment of

Functioning ("GAF") scale.[4]   (Tr. at 179).  The doctor recommended
that the plaintiff undergo monthly counseling.  (Tr. at 181, 183).
At various times during 1999 and 2000, psychiatrists at Gouverneur
Hospital prescribed Mr. Bajana Prozac, Imipramine, and Trazodone.
(Tr. at 181-190).

     Dr. Earl Shaw and Dr. David Myers examined the plaintiff on
May 12, 1999.  (Tr. at 191-93).  He complained of "[l]ower back
pain with numbness in the left leg, aggravated by prolonged
sitting, standing or walking, bending, lifting or twisting and
inclement weather changes." (Tr. at 191-93, 191).  The exams found
"marked lumbar curve flattening, paraspinal [] and iliolumbar
tenderness and hardness, . . . [and], midline operative scar[s]
with scar adherence and surrounding sensory changes."  (Tr. at
191).  There was spasm and tenderness in the flank, gluteal, and
hamstring muscles.  (Tr. at 191).  Mr. Bajana's trunk flexion was
reduced by forty degrees, extension by fifteen degrees, right side
bending by fifteen degrees, and left side bending by twenty
degrees.  (Tr. at 191).  Straight leg raising was reduced by thirty
degrees on the right and forty-five degrees on the left.  (Tr. at
192).  Ankle reflexes were active on the right and sluggish on the

_____

     [4] GAF rates overall psychological functioning on a scale of 0-
100.  Diagnostic and Stastical Manual of Mental Disorders 32 (4th
ed. 2000) ("DSM-IV").  A patient in the range of 51-60 is described
as  having  "[m]oderate  symptoms,"  such  as  flat  affect,
circumstantial speech, and occasional panic attacks, or "moderate
difficulty in social, occupational or school functioning."  Id. at
34.

left and knee reflexes were normal.  (Tr. at 192).  Drs. Shaw and Myers concluded that there was permanent orthopedic disability of 55% of total potential capacity.  (Tr. at 192).

Notes from Gouverneur's Psychiatry Department show that the plaintiff continued to attend monthly counseling sessions through May 2000.  (Tr. at 183-89).  Mental status exams on these dates generally showed Mr. Bajana had depressed or mildly depressed mood with congruent or flat affect, but no hallucinations, delusions, or suicidal or homicidal ideation. (Tr. at 183-89).  Judgment and insight were fair and he was sleeping and eating well.  (Tr. at 183-89).  On August 13, Dr. Bastien noted good improvement.  (Tr. at 185).  On his final visit on May 4, 2000, Mr. Bajana reported that he was getting out of the house a lot, that he slept well, and that he felt "everything is under control."  (Tr. at 189).

Three months after surgery, the plaintiff was examined at the North Hudson Community Action Corporation Health Center on August 24, 1999 and complained of back pain. (Tr. at 195).  Mr. Bajana described having headaches and back pain without radiation.  (Tr. at 195-96).  The only problems revealed upon examination were tenderness in the back with limited flexion. (Tr. at 196).  He was diagnosed with depression, a history of diabetes mellitus 2, obesity, and status post herniated nucleus pulposus at L4-L5.  (Tr. at 196).

Mr. Bajana underwent another MRI on October 5, 1999 which

revealed disc degeneration and post operative changes at the L4-L5 and L5-S1 interspaces and mild epidural fibrosis, most marked on the left side, but no herniation.  (Tr. at 201).

In a mental status evaluation on April 17, 2000, Dr. Joseph Buceta, a consultative physician, reported that the plaintiff had good eye contact, depressed mood, mildly depressed affect, and coherent and goal directed speech without loosening of associations or flight of ideas.  (Tr. at 220).  He found no evidence of hallucinations, delusions, suicidal or homicidal ideation, or feelings of worthlessness or hopelessness.  (Tr. at 220).  The plaintiff's long term memory was intact, although some deficit in short term memory was present.  (Tr. at 220).  Dr. Buceta diagnosed the plaintiff as having chronic adjustment disorder with depressed mood, dependent traits, back pains, pains in the left and right leg, and chronic orthopedic problems.  (Tr. at 221).  He assessed plaintiff's GAF at 60.  (Tr. at 221).

During a psychiatric examination on May 2, 2000, Dr. Jerome B. Margolies noted pain, tenderness, and spasticity in plaintiff's lumbar spine at rest and during flexion, extension, and lateral bending movements.  (Tr. at 208).  He recorded a foward flexion of 30 out of 90 degrees and minimal lateral movements.  (Tr. at 208).  Additionally, he noted pain, tenderness, and spasticity in both hips, especially the left, at rest and during range of motion testing.  (Tr. at 209).  Forward flexion was recorded at 45 out of

100 degrees on the right and 30 out of 100 on the left and all other movements were minimal bilaterally.  (Tr. at 209).  Dr. Margolies recorded that pain, tenderness, and spasticity radiated from the lumbar spine down both lower extremities, especially on the left, and found bilateral lumbar radiculopathy[5] and bilateral sciatica,[6] again especially on the left.  (Tr. at 209).  He diagnosed the plaintiff with emotional problems,[7] post contusion and sprain of the lumbosacral spine and both hips, bilateral lumbar radiculopathy with bilateral sciatica, and post lumbar laminectomy[8] at L4-L5 and L5-S1.  (Tr. at 209).  Dr. Margolies reported that the plaintiff was unable to lift, push, pull, or kneel, but nonetheless recommended that Mr. Bajana undergo a work capacity and diagnostic vocational evaluation.  (Tr. at 209).

    On Dr. Margolies' recommendation, the plaintiff underwent a functional capacity evaluation by Carl Gargiulo, a physical therapist, on June 6, 2000.  (Tr. at 214-17).  Mr. Gargiulo found

---

[5] Radiculopathy is a "disease of the nerve roots." Dorland's at 1595.

[6] Sciatica is a syndrome "most commonly caused by protrusion of a low lumbar intervertebral disk" and "characterized by pain radiating from the back into the buttock and into the lower extremity along its posterior or lateral aspect." Dorland's at 1703.

[7] Dr. Margolies noted that the plaintiff reported that since the accident he could not "sleep, sit, stand or walk for prolonged periods," had "developed an acute depressive state," and had "suicidal ideation" in the past.  (Tr. at 208).

[8] Laminectomy is an "excision of the posterior arch of a vertebra." Dorland's at 1017.

the plaintiff's tolerance for long periods of standing, sustained squatting and bending, and repetitive squatting and bending to be mildly restricted.   (Tr. at 215).   He observed that Mr. Bajana tested positive for symptom magnification and appeared overreactive and sensitive to his pain.   (Tr. at 216).   Mr. Gargiulo opined that Mr. Bajana could do sedentary or light work.   (Tr. at 216).

Dr. Ernesto L. Perdomo, a psychologist, evaluated the plaintiff on May 18, 2000 to determine his ability to participate in a vocational rehabilitation program.   (Tr. at 210-13).   Based on findings similar to those of Drs. Bastien, Buceta, Shaw, and Myers as well as a conclusion that Mr. Bajana's abilities were within the low average range of intelligence, Dr. Perdomo found that Mr. Bajana was a "good candidate for a vocational rehabilitation program . . . and has the ability to work within the limitation of his back problem."   (Tr. at 211-13).

Around the same time, the plaintiff saw Dr. Bastien who assessed no limitations in occupational, educational, work, marital, family, interpersonal, or social interests.   (Tr. 203-04). He concluded that Mr. Bajana had "recovered from any type of depression that he was suffering" and had been "stable for awhile" and that he "mentally appear[s] fit for working."   (Tr. at 204). He assessed the plaintiff's GAF at 90.[9]   (Tr. at 203).

---

[9] A GAF rating of 81-90 indicates "absent or minimal symptoms, . . . good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, [and] no more than everyday problems or concerns."   DSM-

On May 31, 2000, Dr. Alan Friedman, a consultative physician, examined the plaintiff. (Tr. at 222-26). Dr. Friedman reported that Mr. Bajana's medication included Prozac, Motrin, and Trazodone. (Tr. at 223). On examination, Dr. Friedman noted his impression that the plaintiff had residual low back pain. (Tr. at 223). The doctor also noted that reported back pain was not necessarily physiologically related to the muscle groups. (Tr. at 224). He concluded that the plaintiff "may very well benefit from an exercise based goal directed physical therapy program." (Tr. at 224).

On a second mental evaluation performed by Dr. Perdomo on December 13, 2000, Mr. Bajana reported having been in psychiatric treatment until that year, but said he dropped out when he did not improve. (Tr. at 234). At the time, the only medication that Mr. Bajana was reported to have been taking was Prozac. (Tr. at 234-35). The plaintiff described his daily activities as including visiting his brothers and parents, taking public transportation alone, and generally bathing every other day. (Tr. at 235). Dr. Perdomo reported the plaintiff to be fully oriented, with coherent and relevant speech, and found no indication of thought disorder or psychosis, hallucinations, or delusions. (Tr. at 235-36). His mood and affect were depressed and subdued, and his short term memory was fair to mildly impaired with good long term memory and

---

IV at 34.

concentration.  (Tr. at 236).  Dr. Perdomo assessed Mr. Bajana's
dominant problem as his orthopedic disorder, which could affect his
ability to work, but the doctor nonetheless concluded that the
plaintiff was able to function in travel and social situations.
(Tr. at 236-37).  Dr. Perdomo diagnosed dysthymic disorder[10]
secondary to medical problems, chronic adjustment disorder[11] with
depressed mood, and herniated disc with radiculopathy.  (Tr. at
237).

        The record shows that Mr. Bajana did not return for medical
treatment until March 24, 2003, when he was seen in the New York
University Downtown Hospital Family Care Center "to establish
care." (Tr. 343).  Examination results showed no point tenderness
in his back, full range of motion, and normal sensation.  (Tr. at
341).  He was diagnosed with diabetes mellitus and depression, and
given a referral for orthopedic care and mental counseling.  (Tr.
343).

        Mr. Bajana returned to the Family Care Center for blood

---

        [10] Dysthymic disorder is "a mood disorder characterized by
depressed feeling . . ., loss of interest or pleasure in one's
usual activities," and by at least some additional symptoms
including lack of energy, low self esteem, and poor concentration,
among others. Dorland's at 556.  To be considered dysthymic
disorder, symptoms must "have persisted for more than two years
but are not severe enough to meet the criteria for major depressive
disorder."  Id.

        [11] Adjustment disorder is a "maladaptive reaction to
identifiable stressful life events;" this diagnosis "assumes that
the condition will remit when the stress ceases or when the patient
adapts to the situation." Id. at 555.

testing for diabetes in April, June, and September.  (Tr. at 344-48).  On a September 3, 2003 visit, he reported that he felt "ok" and payed a subsequent visit on March 27, 2004 to ask for a refill of medication and complain of an episode of right knee pain aggravated by walking.  (Tr. at 346, 348).

Additionally, the record contains medical documents from St. Mark's Place Institute for Mental Health where the plaintiff began treatment in September 2004 after a diagnosis of alcohol dependence, major depression with psychotic features, and an unspecified personality disorder.  (Tr. at 248, 257).  The plaintiff resumed back treatment by 2006 after his therapist recommended getting a second opinion.  (Tr. at 434).

C. Procedural History

The plaintiff filed an application on January 28, 2000 for DIB and SSI under Titles II and XVI of the Act.  (Tr. at 37, 39).  DIB provides income to individuals who are unable to work because of a disability and are insured for DIB.  42 U.S.C. § 423.  To qualify as insured, applicants must meet requirements of recent work, the duration required varying with age and ending with the quarter in which the applicant became disabled.  42 U.S.C. § 423(c).  SSI is provided to aged, blind, or disabled individuals on the basis of need.  42 U.S.C. §§ 1381, 1382.  The plaintiff's application was denied, both initially and on reconsideration, and Mr. Bajana requested a hearing before an Administrative Law Judge ("ALJ").

12

(Tr. at 39-44, 49-51, 52).  He appeared at a hearing before ALJ John M. Farley on July 23, 2002.  (Tr. at 473-96).  Considering the case de novo, ALJ Farley issued a decision on August 28, 2002, finding that the plaintiff was not disabled.  (Tr. at 59-64). After granting Mr. Bajana's request for review, the Appeals Council issued an order on July 17, 2003 remanding the case to the ALJ for a supplemental hearing.  (Tr. 74-77).

After a hearing on September 12, 2003 at which the plaintiff appeared and testified through an interpreter with his attorney present, ALJ Farley issued a decision on February 24, 2004, finding the plaintiff disabled as of October 2, 2002, but not before.  (Tr. at 405-23, 90-98).  Once again, the Appeals Council granted the plaintiff's request for review and, on February 4, 2005, once again issued an order vacating the ALJ's decision and remanding for a further supplemental hearing.  (Tr. at 104-07).  The Appeals Council ordered an evaluation of the opinion of Dr. Margolies and clarification of Mr. Bajana's literacy and ability to communicate in English.[12]  (Tr. at 105-06).  The Appeals Council also ordered

---

[12] "Medical-Vocational rules 201.23 and 201.17 are applicable to individuals who are illiterate or unable to communicate in English."  (Tr. at 106).  The ALJ cited Medical-Vocational rule 201.27 to direct a conclusion of "not disabled," indicating that the plaintiff was literate and able to communicate in English. (Tr. at 106).  However, there was a discrepancy between the February 2004 decision that stated that Mr. Bajana had completed high school in Ecuador and a hearing decision on a separate disability claim on April 8, 1999, affirmed by the District Court of New Jersey on July 19, 2004, that indicated he had obtained a high school equivalency diploma in New York.  (Tr. at 106).

13

the ALJ to update evidence on the plaintiff's medical condition, to give further consideration to his residual functional capacity, and to obtain evidence from a vocational expert if warranted by the expanded record. (Tr. at 106).

On remand, the plaintiff's case was assigned to ALJ Kenneth G. Levin who, on May 18, 2006, held a supplemental hearing at which the plaintiff appeared with counsel and again testified through an interpreter. (Tr. 424-73). In addition, the ALJ heard the testimony of Dr. C. Plotz who assessed the history of the plaintiff's physical condition (Tr. 449-61), of Dr. M. Friedman who opined on his mental condition (Tr. at 481-68), and of a vocational expert, Melissa Fass-Karlin. (Tr. at 468-72).

Dr. Plotz noted that Mr. Bajana's neurological examinations revealed only minor changes following his accident, if any, and that he was sensitive to pain. (Tr. at 450). Dr. Plotz diagnosed low back pain without an obvious cause and noted that the plaintiff's recent MRI showed degenerative disc disease, bulges, and root encroachment that were not significant. (Tr. at 451-52). He offered his opinion that the plaintiff would be able to lift up to 20 pounds, could stand and walk not more than six hours per workday, and should have no limit on his ability to sit. (Tr. at 452).

The second medical expert, Dr. Friedman, found that Mr. Bajana could not work as of the time he began treatment at St. Mark's

Place Mental Health Center in September 2004 due to a worsening of his mental condition. (Tr. at 463). He opined that a psychotic component was universally identified in more recent evaluations, whereas evaluations from the previous period of treatment "vacillat[ed]" over whether there was any psychotic component. (Tr. at 463). Although Mr. Bajana had developed an alcohol abuse problem, Dr. Friedman judged that this was in response to his physical symptoms. (Tr. at 463). Dr. Friedman related that, prior to December 2001, the plaintiff had mild limitations in daily activities and in maintaining concentration, persistence, and pace, and moderate limitations in maintaining social functioning. (Tr. at 464). Dr. Friedman opined that Mr. Bajana would have some difficulty with co-workers and supervisors, but, nonetheless, could perform "simple, routine, low contact, low stress work." (Tr. at 464, 467).

The vocational expert, Ms. Fass-Karlin, found that a hypothetical individual with the plaintiff's age, education level, work experience, and English language abilities could work as an assembler of small products, a machine tender, a marker, a bench hand, or an assembler of jewelry. (Tr. at 468). She further noted that each of these jobs does not require frequent interaction with either coworkers or a supervisor, although interaction with a supervisor may occur on a regular basis. (Tr. at 469-472).

In a May 31, 2006 decision, ALJ Levin found the plaintiff

disabled as of September 1, 2004.  (Tr. at 36).  This finding made
him ineligible for DIB because of the lapse between his injury on
the job in 1997 and his becoming disabled in 2004.  Nevertheless,
he was eligible for SSI starting on September 1, 2004.  (Tr. at
36).  In supporting his conclusion that Mr. Bajana became disabled
in 2004, ALJ Levin noted the period of time during which the
plaintiff failed to obtain treatment for his back infirmities and
for his mental health.  (Tr. at 32-33).  On the evidence as a
whole, the ALJ found that Mr. Bajana had the mental ability to
perform competitive work until September 1, 2004 when he resumed
treatment for his mental condition.  (Tr. at 33-34).  The ALJ
relied on the findings of a vocational expert to determine that the
plaintiff could perform work in the national economy before
September 2004.  (Tr. at 34).  Responding to the Appeals Council's
concern, ALJ Levin wrote that Dr. Margolies' claim that the
plaintiff could not lift, push, pull, or kneel could be taken
literally given the other medical evaluations in the record that
indicated he could work.  (Tr. at 32).  In support of this
conclusion, he noted Dr. Margolies' own recommendation that Mr.
Bajana undergo a work capacity evaluation.  (Tr. at 32).  The ALJ
wrote that this would indicate that Dr. Margolies did not mean that
the plaintiff could not work at all and that Dr. Margolies had
"entertained the possibility" that the plaintiff could work.  (Tr.
at 32).  Further responding to the Appeals Council's remand, the

ALJ found that the claimant had completed an education equivalent to high school but was unable to communicate in English.  (Tr. at 35).

The Appeals Council denied Mr. Bajana's request for review on July 16, 2008, making this the final decision of the Commissioner. (Tr. at 6-8).   The plaintiff then filed this action <u>pro</u> <u>se</u>. Pursuant to a schedule that I established, the Commissioner filed the instant motion.  When the plaintiff did not respond, I extended his time to do so and warned that if no response was filed, I would consider the motion on the existing record.  The revised deadline has passed, and the plaintiff has still not answered the Commissioner's motion.

<u>Discussion</u>

    A.  <u>Determining Disability</u>

A claimant seeking disability benefits under the Social Security Act is considered disabled if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).   In order to determine whether a claimant is disabled, the ALJ follows a five-step process outlined in regulations promulgated under the Act.   <u>See</u> 20 C.F.R. § 416.920(a)(4); <u>see also</u> <u>Curry v. Apfel</u>, 209 F.3d 117, 122 (2d Cir.

2000) (describing five-step process in parallel statutory provision for disability benefits); <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999) (same); <u>Balsamo v. Chater</u>, 142 F.3d 75, 79-80 (2d Cir. 1998)(same). First, the ALJ determines if the claimant is currently engaged in substantial gainful activity. <u>See</u> 20 C.F.R. § 416.920(a)(4)(i) & (b). If he is not, the ALJ must decide if the claimant has a severe impairment, one that "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(a)(4)(ii) & (c). If the claimant's impairment is severe and is either listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to a listed impairment, the claimant must automatically be found disabled without considering vocational factors such as age, education, and work experience. <u>See</u> 20 C.F.R. § 416.920(a)(4)(iii) & (d). If the claimant's impairment is severe but is not listed or equal to a listed impairment, a finding of not disabled is directed if his residual functional capacity permits him to do the work he did in the past. <u>See</u> 20 C.F.R. § 416.920(a)(4)(iv), (e), & (f). If the claimant is unable to perform his past work, the ALJ must decide if there is other available work that the claimant is able to perform based on his residual functional capacity. <u>See</u> 20 C.F.R. § 404.1520(a)(4)(v) & (g)(1). The claimant bears the burden of proof with respect to the first four steps in the analysis. <u>Curry</u>, 209 F.3d at 122-23. If the claimant demonstrates an inability to

perform past work, the Commissioner must show that there is work in the national economy that the claimant can do; the Commissioner need not, however, provide additional evidence of the claimant's residual functional capacity. Poupore v. Astrue, __ F.3d. __, __, No. 08-0659, 2009 WL 1383274, at *2 (2d Cir. May 21, 2009).

    B.   Standard of Review

    Reviewing a social security disability determination involves two levels of inquiry. First, the court analyzes the Commissioner's decision to determine whether the correct legal standard was applied. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008); Lugo v. Chater, 932 F. Supp. 497, 500 (S.D.N.Y. 1996). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. See Tejada, 167 F.3d at 773-74; Balsamo, 142 F.3d at 79; Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009); see also 42 U.S.C. § 405(g) (providing that "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive[.]"). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229 (1938)); see also Pratts v. Chater, 94 F.3d 34,

37 (2d Cir. 1996).  "[T]o determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence[.]" Brown, 174 F.3d at 62 (quotation marks and citation omitted); see also Botta v. Barnhart, 475 F. Supp. 2d 174, 186 (E.D.N.Y. 2007).

C.  Disability Determination

Because Mr. Bajana had not been engaged in substantial gainful activity, had neither a listed condition nor one that could be considered equivalent to such a condition, and could not perform his past work, the ALJ was required to determine whether he retained the residual functional capacity to perform other work and whether such work exists in the national economy.

The ALJ's conclusion that the plaintiff retained the residual functional capacity to perform light work is supported by substantial evidence.  As discussed in more detail below, the plaintiff's failure to seek treatment for both his medical and physical ailments during the relevant period suggests that his condition was not severe enough to prevent him from working. Furthermore, the ALJ relied appropriately on the testimony of a vocational expert to conclude that other work for which the plaintiff was qualified could have been found in the national economy.

1.  Residual Functional Capacity Determination

In order to assess residual functional capacity, defined as

the most an individual can still do after considering the effects of physical and mental limitations on his ability to perform work-related tasks, the ALJ must consider all relevant evidence, including all symptoms and any medical opinions.  20 C.F.R. §§ 404.1545, 404.1527.  The ALJ must also determine the extent to which the symptoms can reasonably be accepted as consistent with objective medical evidence and other evidence.  20 C.F.R. § 404.1529.

The plaintiff's sporadic medical treatment for both his mental and physical conditions during the relevant period provides ample evidence of a residual functional capacity sufficient to allow work.  There is no evidence in the record that Mr. Bajana sought treatment for back pain until January 2006 despite complaints of pain in the lower back, thoracic spine, and cervical spine "off and on for the preceding eight years."  (Tr. at 435-36).  Furthermore, his refusal of facet block injections was not based on any substantive medical rationale; rather, the plaintiff chose not to pursue this treatment merely because it was "not guaranteed."  (Tr. at 434).  Mr. Bajana claims that the doctor said that "therapy in all other forms would [not] be useful."  (Tr. at 433).  However, Dr. Peterson, who recommended the injections, stated that,  if Mr. Bajana did not respond to the injections and if results of a lumbar discography were positive, he would recommend interbody fusion.  (Tr. at 159).  In addition, Dr. Peterson noted that Dr. Krieger,

21

who performed an independent medical evaluation on June 29, 1998, stated that Mr. Bajana required no further treatment.  (Tr. at 159).

The lull in treatment after the plaintiff's psychiatric care with Dr. Bastien at Gouverneur Hospital suggests that Mr. Bajana did have the ability to work during the relevant period.  After receiving treatment for his mental condition in 1999 and 2000 from Gouverneur Hospital (Tr. at 169-90), the plaintiff did not again seek psychiatric care until September 2004.  (Tr. at 248-59).  The plaintiff claimed in his 2006 hearing that he stopped seeking treatment at Gouverneur Hospital for financial reasons (Tr. at 448), but hospital records indicate that treatment terminated because the plaintiff had "recovered" and "everything [was] under control." (Tr. at 189, 204).  Additionally, while contemporaneous psychiatric treatment reports by Dr. Perdomo and Dr. Buceta found mild abnormalities, Dr. Perdomo suggested that Mr. Bajana remained a good candidate for vocational rehabilitation, and Dr. Buceta suggested that his "psychiatric prognosis" with treatment was "at least fair." (Tr. at 211-13, 220-21).

In addition, medical evidence supports the ALJ's finding that Mr. Bajana could have performed light work despite limitations created by his accident and other physical ailments.  Dr. Plotz testified in the 2006 ALJ hearing that the plaintiff had indeed retained residual functional capacity for light work in the

22

relevant period.  (Tr. at 452).  He found only that, in any potential vocation, Mr. Bajana should not lift and carry more than 20 pounds and should not stand and walk for more than six hours during an eight hour workday.  (Tr. at 452).  He further opined that the plaintiff had no limitations in sitting, assuming he is allowed to shift position.  (Tr. at 452).  This determination was not contradicted by the concurrent evaluations of Drs. Shaw, Myers, Friedman, and Mahan.  (Tr. at 191-93, 222-24, 229-31).  A report by Dr. Margolies' stated that the plaintiff cannot "lift, push, pull, or kneel," and that he self-reported that he "cannot sleep, sit, stand or walk for prolonged periods.  (Tr. at 208-09). While this might appear to suggest that Mr. Bajana cannot perform any work (Tr. 209) , the analysis of the physical therapist to whom Dr. Margolies referred Mr. Bajana suggested that he could re-enter the workforce.  (Tr. at 216).  The therapist concluded that the plaintiff could do sedentary or light work despite questionable tolerance of long periods of standing, sitting, sustained squatting, and bending.  (Tr. at 214-17).

Mr. Bajana also claimed that he was only able to sit for 15 minutes at one time and had to lie down constantly due to his back pain.  (Tr. at 490, 492).  However, Mr. Gargiulo's evaluation in 2000 indicated that Mr. Bajana had a propensity to magnify his symptoms, and that he was sensitive and overreactive to pain.  (Tr. at 216).  In addition, during the relevant period, the plaintiff

reported that he spent his days "roaming the streets" and engaged in a fairly independent life style, including taking public transportation alone and taking care of his personal needs.  (Tr. at 235).

The ALJ's finding the plaintiff retained the residual functional capacity to perform light work is also supported by evaluations of Mr. Bajana's psychological condition.  In the 2006 ALJ hearing, Dr. Friedman found that Mr. Bajana was only unable to work as of when he began treatment at St. Mark's Place Institute in 2004, not earlier.  (Tr. at 463).  Dr. Friedman explained that though St. Mark's evaluations of Mr. Bajana found a "psychotic component" to his depression, prior evaluations generally took a "less grave view" of his mental health.  (Tr. at 463).  When he completed treatment at Gouverneur Hospital in 2000, the records indicate that Mr. Bajana had "recovered from any type of depression that he was suffering," had been "stable for awhile," and appeared mentally "fit for working," (Tr. at 204); there is no evidence that the plaintiff's condition degraded after his successful treatment at Gouverneur Hospital and before his evaluation at St. Mark's.

## 2.  Other Work in the National Economy

The ALJ's finding that the plaintiff could do other work is likewise supported by substantial evidence.  For work to exist in the national economy, it must be available in significant numbers, must have requirements that the claimant can meet based on

physical, mental, and vocational abilities, and must exist in the region where the claimant lives "or in several other regions of the country." 20 C.F.R. § 404.1566(a) & (b). The Commissioner may use a vocational expert to determine the existence of work in the national economy that a claimant can perform. 20 C.F.R. § 404.1566(e). The expert, in turn, may provide an opinion based on hypothetical facts, as long as there is substantial evidence in the record supporting those facts. Wolfe v. Commissioner of Social Security, 272 Fed. Appx. 21, 23 (2d Cir. 2008); Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983). In the instant case, the ALJ presented a hypothetical based on the plaintiff's age, education, work experience, and residual functional capacity. (Tr. at 468). Armed with this information, the vocational expert found that the hypothetical individual could have performed the jobs of a small products assembler, machine tender, marker, bench hand, and jewelry assembler. (Tr. at 468). Given the findings of the vocational expert, substantial evidence supports the ALJ's conclusion that Mr. Bajana could have performed other work in the national economy.

Conclusion

For the reasons set forth above, I recommend that the defendant's motion be granted and judgment be entered in favor of the defendant. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties

shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, Room 650, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          June 9, 2009

Copies mailed this date:

Secundino Bajana
84 Clinton Street, Apt. #1B
New York, New York 10002

Susan C. Branagan, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007

26